AO 442 (Rev. 11/11) Arrest Warrant

# UNITED STATES DISTRICT COURT

for the

District of Puerto Rico

**FILED**
**UNITED STATES DISTRICT COURT**
**DENVER, COLORADO**
10:49 am, Aug 10, 2022
**JEFFREY P. COLWELL, CLERK**

United States of America

v.

Hermes Carrillo-Joves  (11 )

_____
*Defendant*

)
)
)
)
)
)

Case No. 22-090 (RAM)
Colorado Case No. 1:22-mj-00135-KHR

## ARREST WARRANT

To:      Any authorized law enforcement officer

**YOU ARE COMMANDED** to arrest and bring before a United States magistrate judge without unnecessary delay
*(name of person to be arrested)*     Hermes Carrillo-Joves,
who is accused of an offense or violation based on the following document filed with the court:

☑ Indictment          ☐ Superseding Indictment          ☐ Information          ☐ Superseding Information          ☐ Complaint
☐ Probation Violation Petition          ☐ Supervised Release Violation Petition          ☐ Violation Notice          ☐ Order of the Court

This offense is briefly described as follows:

18 U.S.C. § 1956(h)                    Money Laundering Conspiracy

Date:      03/09/22

City and state:    Hato Rey, PR

_____
*Issuing officer's signature*   Deputy Clerk

_____
Giselle López-Soler, US Magistrate District Judge
*Printed name and title*

| Return |
|---|
| This warrant was received on *(date)*_____, and the person was arrested on *(date)* _____ at *(city and state)* _____ .   Date: 8-10-2022           _____  *Arresting officer's signature*    Mark Capa  *Printed name and title* |

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

RECEIVED AND FILED

CLERK'S OFFICE USDC PR

2022 MAR 9 PM 4:19

| | |
|---|---|
| **UNITED STATES OF AMERICA**<br><br>v.<br><br>**[1] LEONARDO DAVID ALCALA-CARRILLO**, aka Leonardo David Alcala, aka David Alcala;<br><br>**[2] JOSBERT ALEXANDER RAMONES-CARRILLO;**<br><br>**[3] ROMMEL JESUS BAEZ-GONZALEZ;**<br><br>**[4] JUAN EDUARDO CARRILLO-ALVIAREZ**, aka Juanchi;<br><br>**[5] JORGE L. ALCALA-REQUENA;**<br><br>**[6] YOSIMAR DEL CARMEN RIVAS-HERNANDEZ**, aka Yosi;<br><br>**[7] ZULYMAR DEL CARMEN RIVAS-HERNANDEZ**, aka Zully;<br><br>**[8] JOSUE DIYANDY RIVAS-VALERO;**<br><br>**[9] JUAN PABLO MORALES-AYALA;**<br><br>**[10] FRANKLIN AUGUSTO LOPEZ-RAMIREZ**; and<br><br>**[11] HERMES CARRILLO-JOVES,** aka Tio Hermes,<br><br>       Defendants. | **INDICTMENT**<br><br>No.: *22-090 (RAM)*<br><br>**UNDER SEAL**<br><br>ONE COUNT & FORFEITURE NOTICE<br><br>18 U.S.C. § 1956(h) |

**INDICTMENT**

The Grand Jury charges:

### Introduction

At all times material to this Indictment:

1.    Beginning on a date unknown to the Grand Jury but not later than 2017, and continuing through the return of this Indictment, Defendants operated a transnational money laundering organization referred to in this Indictment as the "Alcala Network."  The Alcala Network provided money laundering services to people who were at times referred to as "proveedores," or suppliers, who sought to repatriate drug proceeds from locations in the United States, including Puerto Rico, to the Republic of Colombia. .

2.    The Alcala Network's U.S.-based leader managed several accounts at U.S. financial institutions that were used to receive wire transfers, cash and check deposits, and peer-to-peer transfers of illicit U.S. dollars.  The Alcala Network's Colombia-based leaders coordinated the withdrawal of those funds from ATMs in Colombia, followed by clandestine deliveries of bulk Colombian pesos and deposits of Colombian pesos into accounts at Colombian financial institutions.

3.    The Alcala Network created fictitious business entities, or "shell companies," in the United States and used them to acquire "shell accounts" at U.S. financial institutions.  Members of the Alcala Network also opened accounts in their true names and used those accounts in furtherance of the scheme.

4.    Some shell accounts were used to receive and transfer U.S. dollars to other accounts in the Alcala Network, while other shell accounts were used to

2

primarily to transmit funds to Colombia through ATM/Debit card transactions. In addition, members of the Alcala Network at times transacted in virtual currency.

5. Over the course of the conspiracy, the Alcala Network coordinated more than 100,000 ATM withdrawals in Colombia using more than 400 ATM/Debit cards linked to Alcala Network shell and personal accounts. The total amount transmitted to Colombia in this manner exceeded $26,000,000.

### The Alcala Network

6. The Alcala Network has a hierarchical structure, with a command-and-control element coordinating the activities of several shell company owners and "plateros" or "domiciliarios," who were employees of the Alcala Network responsible for making ATM withdrawals and conducting clandestine deliveries and deposits of cash in Colombia.

7. **[1] LEONARDO DAVID ALCALA-CARRILLO**, aka Leonardo David Alcala, aka David Alcala, is the U.S.-based leader of the Alcala Network. Alcala-Carrillo managed the Alcala Network's shell company owners and coordinated the activity in the shell accounts. He is also a shell company owner who created and managed some of the Alcala Network's shell accounts. Alcala-Carrillo established the following shell companies:

| Shell Company | State/Date Established | Stated Line of Business |
|---|---|---|
| LM Advance Corp | Florida 2/21/19 | General Freight Trucking, local; Automotive Transport Distributors |
| Exportrading Global Corp | Florida 9/3/19 | Automobile and other motor vehicle merchant |

3

| | | wholesale; auto buying and selling |
|---|---|---|
| LJJ Finance, LLC | Florida 2/6/20 | Management Company and Business Consulting for ecommerce business |

8.    **[2] JOSBERT ALEXANDER RAMONES-CARRILLO** is one of the Colombia-based leaders of the Alcala Network and a citizen of Venezuela. Ramones-Carrillo coordinated with proveedores to direct funds into the Alcala Network's accounts. He also employed plateros or domiciliarios in Colombia who executed clandestine bulk-peso deliveries and deposits in Colombia.

9.    **[3] ROMMEL JESUS BAEZ-GONZALEZ** is one of the Colombia-based leaders of the Alcala Network and a citizen of Venezuela. Baez-Gonzalez coordinated with proveedores to direct funds into the Alcala Network's accounts. He also employed plateros or domiciliarios in Colombia who executed clandestine bulk-peso deliveries and deposits in Colombia.

10.    **[4] JUAN EDUARDO CARRILLO-ALVIAREZ**, aka Juanchi, is one of the Colombia-based leaders of the Alcala Network and a citizen of Venezuela. Carrillo-Alviarez coordinated with proveedores to direct funds into the Alcala Network's accounts.

11.    **[5] JORGE L. ALCALA-REQUENA** is a U.S.-based shell company owner who created and managed some of the Alcala Network's shell accounts.

| Shell Company | State/Date Established | Stated Line of Business |
|---|---|---|
| LMA Invest 2020 Corp | Florida 2/10/2020 | Consulting business in the area of trading goods |

4

12.    **[6] YOSIMAR DEL CARMEN RIVAS-HERNANDEZ**, aka Yosi, is a U.S.-based shell company owner who created and managed some of the Alcala Network's shell accounts.

| Shell Company | State/Date Established | Stated Line of Business |
|---|---|---|
| YR Autoparts Corp | Florida 3/16/20 | Automotive Parts and Accessories Stores; Automotive parts and supply stores to export |
| VIP Motor Store Corp | Florida 5/7/20 | Automotive Parts and Accessories Stores; Auto part store |
| Financexcel Corp | Florida 7/27/20 | Automotive Parts and Accessories Stores, auto part sales car financing |

13.    **[7] ZULYMAR DEL CARMEN RIVAS-HERNANDEZ** is a U.S.-based shell company owner who created and managed some of the Alcala Network's shell accounts.   Zulymar Rivas-Hernandez also helped create websites, email addresses, and documentation for the Alcala Network's shell companies.

| Shell Company | State/Date Established | Stated Line of Business |
|---|---|---|
| Newvia Corp | Florida 8/17/20 | Graphic Design Services, marketing and graphic design |

14.    **[8] JOSUE DIYANDY RIVAS-VALERO** is a U.S.-based shell company owner who created and managed some of the Alcala Network's shell accounts.

| Shell Company | State/Date Established | Stated Line of Business |
|---|---|---|
| Close Worldwide Corp | Florida Corp 9/30/20 | Transportation Equipment and Supplies (except Motor Vehicle) - general transportation |

| Rivasexport Corp | Florida Corp 10/2/20 | Navigational services to shipping, food candy transportation |

15.　**[9] JUAN PABLO MORALES-AYALA** is a U.S.-based shell company owner who created and managed some of the Alcala Network's shell accounts.

| Shell Company | State/Date Established | Stated Line of Business |
|---|---|---|
| JM Auto Investors Corp | Florida 2/10/20 | Automobile and other Motor Vehicle Merchant Wholesales, auto sales |
| New Era Global Business Corp | Florida 2/19/20 | Marketing Consulting Services |

16.　**[10] FRANKLIN AUGUSTO LOPEZ-RAMIREZ** is a U.S.-based shell company owner who created and managed some of the Alcala Network's shell accounts.

| Shell Company | State/Date Established | Stated Line of Business |
|---|---|---|
| Flora Export Corp | Florida 4/21/20 | Other Motor Vehicle Parts Manufacturing, import and export of Auto Parts |
| Sportroad Corp | Florida 7/28/20 | Luxury car parts |

17.　**[11] HERMES CARRILLO-JOVES** is a U.S.-based shell company owner who created and managed some of the Alcala Network's shell accounts.

| Shell Company | State/Date Established | Stated Line of Business |
|---|---|---|
| Brown Star, LLC | South Carolina 9/1/20 | Utilities, selling solar panels |
| BioAvila, LLC | South Carolina 6/11/20 | Other Services (except Public Administration), Solar Panel Sales; |

6

18.    Other Alcala Network shell companies include:

| Shell Company | State/Date Established | Stated Line of Business |
|---|---|---|
| JD One Service, LLC | South Carolina 8/12/20 | Agriculture, Forestry, Fishing and Hunting, landscapes |

## Background on Virtual Currency

19.    At all times relevant to this Indictment, virtual currency was a digital form of value that was circulated over the Internet which was not backed by a government.  Those wishing to transact in virtual currency were able to do so through a virtual currency exchange or directly with others in peer-to-peer transactions.

20.    A virtual currency exchange was a business that allowed customers to buy, sell, or trade virtual currency.

21.    Virtual currency "wallets" were used to store and transact in virtual currency and could include many distinct virtual currency addresses.  Virtual currency addresses were roughly equivalent to account numbers.

22.    To send virtual currency from one address to another, all that was required was the public virtual currency address of the recipient.  Each virtual currency address had a corresponding private key, which was roughly equivalent to a complex password or PIN code.  Accordingly, the private key was needed to spend any virtual currency contained in the address.

## Background on Federal Currency Transaction Reporting Requirements

23.    At all times relevant to this Indictment, federal law required financial institutions to report currency (cash or coin) transactions over $10,000 conducted by,

7

or on behalf of, one person, as well as multiple currency transactions that aggregated to be over $10,000 in a single day. These transactions were reported on Currency Transaction Reports (or "CTRs"). A "currency transaction" included deposits, withdrawals, exchanges, and other payments of currency by, through, or to such financial institutions.

## COUNT ONE
### Money Laundering Conspiracy
### 18 U.S.C. § 1956(h)

24.     The allegations contained in paragraphs 1 through 23 of this Indictment are hereby realleged and incorporated by reference as if fully set forth herein.

25.     Beginning on a date unknown to the Grand Jury but not later than 2017, and continuing through the return of this Indictment, within the District of Puerto Rico and elsewhere, and within the jurisdiction of this Court, the defendants,

**[1] LEONARDO DAVID ALCALA-CARRILLO,**
aka Leonardo David Alcala, aka David Alcala;

**[2] JOSBERT ALEXANDER RAMONES-CARRILLO;**

**[3] ROMMEL JESUS BAEZ-GONZALEZ;**

**[4] JUAN EDUARDO CARRILLO-ALVIAREZ,**
aka Juanchi;

**[5] JORGE L. ALCALA-REQUENA,**

**[6] YOSIMAR DEL CARMEN RIVAS-HERNANDEZ,**
aka Yosi;

**[7] ZULYMAR DEL CARMEN RIVAS-HERNANDEZ,**
aka Zully;

**[8] JOSUE DIYANDY RIVAS-VALERO;**

8

**[9] JUAN PABLO MORALES-AYALA;**

**[10] FRANKLIN LOPEZ-RAMIREZ;** and

**[11] HERMES CARRILLO-JOVES,**
aka Tio Hermes,

knowingly conspired and agreed with each other and with other persons known and

unknown to the Grand Jury to violate 18 U.S.C. §§ 1956 and 1957, including by:

a)   knowingly conducting and attempting to conduct financial transactions involving monetary instruments affecting interstate and foreign commerce, which transactions involved the proceeds of a specified unlawful activity, that is, the felonious manufacture, importation, receiving, concealment, buying, selling and otherwise dealing in controlled substances, knowing the property involved in the financial transactions represented the proceeds of some form of unlawful activity and knowing the transactions were designed in whole and in part to conceal and disguise the nature, location, source, ownership, and control of the proceeds of specified unlawful activity, in violation of 18 U.S.C. § 1956(a)(1)(B)(i);

b)   knowingly conducting and attempting to conduct financial transactions involving monetary instruments affecting interstate and foreign commerce, which transactions involved the proceeds of a specified unlawful activity, that is, the felonious manufacture, importation, receiving, concealment, buying, selling and otherwise dealing in controlled substances, knowing the property involved in the financial transactions represented the proceeds of some form of unlawful activity and knowing the transactions were designed in whole and in part to avoid a transaction reporting requirement under State or Federal law, in violation of 18 U.S.C. § 1956(a)(1)(B)(ii);

c)   knowingly transporting, transmitting, and transferring, and attempting to transport, transmit, and transfer a monetary instrument and funds from a place in the United States to and through a place outside the United States knowing the monetary instrument and funds involved in the transportation, transmission, and transfer represent the

9

proceeds of some form of unlawful activity and knowing that such transportation, transmission, and transfer is designed in whole and in part to conceal and disguise the nature, the location, the source, the ownership, and the control of the proceeds of specified unlawful activity, in violation of 18 U.S.C. § 1956(a)(2)(B)(i); and

d)      knowingly engaging and attempting to engage in a monetary transaction in criminally derived property of a value greater than $10,000 and is derived from specified unlawful activity, that is, the felonious manufacture, importation, receiving, concealment, buying, selling and otherwise dealing in controlled substances, in violation of 18 U.S.C. § 1957.

## Object of the Conspiracy

26.      The object of the conspiracy was to realize personal gain by using the U.S. financial system to conceal proceeds from the felonious manufacture, importation, receiving, concealment, buying, selling, and otherwise dealing in controlled substances, and transfer those illicit proceeds from places within the United States, including the District of Puerto Rico, to places outside the United States, including the Republic of Colombia. The object of the conspiracy involved violations of 18 U.S.C. §§ 1956 and 1957.

## Manner and Means of the Conspiracy

It was part of the manner and means of the conspiracy that:

## General Operation of the Alcala Network

27.      Members of the Alcala Network used encrypted messaging applications to communicate in furtherance of the conspiracy.

10

28.    Multiple email addresses were created and used in furtherance of the scheme.

29.    Members of the Alcala Network operating from Colombia at times masked their true locations using virtual private networks to log into U.S.-based online services.

30.    Members of the Alcala Network maintained electronic and handwritten ledgers and circulated them among themselves.

31.    Members of the Alcala Network earned profits and commissions for their participation in the scheme.  Leaders earned profits by charging fees based on the Colombian TRM ("Tasa Representativa del Mercado") or official exchange rate set by the Colombian government of Colombian pesos ("COP") to United States dollars ("USD").

32.    Alcala Network leaders charged a higher USD – COP exchange rate to conduct riskier transactions.  For example, Alcala Network leaders gave a less favorable exchange rate for cash deposits into Alcala Network shell accounts, whereas there was a more favorable exchange rate for wire or peer-to-peer transfers, which were believed to be safer.

33.    Shell company owners earned commissions based on the number of shell accounts they could open at U.S. financial institutions and the number of ATM/Debit cards they could obtain for their shell accounts.  Shell company owners were also offered a bonus, which was a set number of Colombian pesos per dollar moved through the shell accounts in a given period.

11

34.    Peer-to-peer transfers were used to pay commissions, fees, and expenses to Alcala Network members and others who provided services in furtherance of the scheme.

### Establishing Shell Accounts

35.    Shell companies were registered in Florida and South Carolina. Federal tax identification numbers from the U.S. Internal Revenue Service were obtained for the shell companies.

36.    Shell accounts at various U.S. financial institutions were obtained on behalf of the shell companies.   The financial institutions were provided false information about the nature of shell companies' businesses and the nature of the transactions in the shell accounts.  Members of the Alcala Network also obtained personal accounts in their true names for use in furtherance of the scheme.

37.    After the shell accounts were established at the financial institutions, the login information for the shell accounts' online banking platforms was shared with Alcala Network leaders.  That way, the leaders could monitor and coordinate the account activity.

38.    Shell accounts were used for different purposes.  Some of the shell accounts were used as accounts that receive funds and forward them to other Alcala Network shell accounts.  Most of the shell accounts, however, were used to obtain several ATM/Debit cards.  False representations were made to the financial institutions that the ATM/Debit cards were for employees who were working in Colombia.

12

39.    In reality, however, the ATM/Debit cards were mailed to Alcala Network leaders operating from Colombia.  The leaders gave those ATM cards to plateros or domiciliarios, who were not employees of the shell companies but instead employees of the Alcala Network.

40.    ATM/Debit cards were obtained from the financial institutions using the true names and identifying information of the plateros or domiciliarios.  That way, if the plateros or domiciliarios encountered law enforcement in Colombia, they could present the cards under their true names, thereby increasing the chances that they could avoid scrutiny or arrest.

### Money Flows through the Alcala Network

#### Clandestine Money Pickups in the United States

41.    "Money brokers," who generally operated from Colombia, solicited what are referred to as "money contracts" from the owners of illicit proceeds generated from the felonious manufacture, importation, receiving, concealment, buying, selling and otherwise dealing in controlled substances in Puerto Rico and elsewhere in the United States.

42.    The money brokers arranged for illicit proceeds in the form of bulk U.S. currency to be picked up from couriers in Puerto Rico and elsewhere and then moved by wire transfer through U.S. financial institutions to bank accounts designated by the money broker, including Alcala Network accounts.

13

43.     When the bulk currency was transferred between couriers, each courier was required to have the same secret code phrase to assure each other that they were meeting the right party.

44.     Couriers also carried the same serial number of a U.S. dollar bill, known as a "token," to ensure that when the bulk currency was being transferred between the couriers they would know they were meeting the right party.

45.     Couriers met in public locations and carried the money in a concealed manner, such as in duffel bags.  When the deliveries were complete, the courier was expected to obtain proof, which usually was a photograph of the token.

The Proveedores

46.     Alcala Network leaders provided proveedores with wire transfer instructions and account information for the shell accounts and personal accounts in the Alcala Network.

47.     Drug proceeds comprised of U.S. dollars were then deposited into the accounts using various methods including cash, check, and money order deposits, wire transfers, and peer-to-peer transactions.  Alcala Network accounts received and sent numerous wire transfers of illicit proceeds in amounts exceeding $10,000.

48.     Members of the Alcala Network maintained virtual currency wallets, which were at times used to send and receive virtual currency through virtual currency exchanges transactions in furtherance of the scheme.

49.     Alcala Network leaders instructed proveedores to deposit cash into Alcala Network accounts in amounts under $10,000, usually in amounts between

14

$5,000 and $7,500, to avoid financial institutions' federal reporting requirements and scrutiny by both the financial institutions and law enforcement.

50.     Once a wire transfer occurred, confirmation of the transaction was sent to Alcala Network leaders.  Confirmation was also sent once the wire was credited to the account.

51.     After cash, check, and money order deposits of illicit proceeds, photographs of the deposit receipts were sent to Alcala Network leaders as confirmation of the deposits.  For the cash deposits, alphanumeric codes were handwritten on the deposit receipts.

### Withdrawals and Deliveries in Colombia

52.     After illicit proceeds were transferred or deposited into Alcala Network accounts, the leaders, plateros, or domiciliarios operating in Colombia withdrew the proceeds from ATMs in Colombia using the accounts' ATM/debit cards.  Sometimes the proceeds were transferred among multiple accounts to further conceal the audit trail before the proceeds were withdrawn from ATMs in Colombia.

53.     Once the deposits were confirmed, delivery information was sent to Alcala Network leaders.  Alcala Network leaders were provided either a "cuenta," or account, or "token" to be used in connection with a bulk-cash delivery of Colombian pesos in Colombia.

54.     If the Alcala Network leaders were provided a cuenta, the leaders, plateros, or domiciliarios operating in Colombia withdrew the illicit proceeds from Colombian ATMs and then deposited them into accounts at Colombian financial

15

institutions specified by the proveedores. Alcala Network leaders were often provided multiple cuentas, allowing larger amounts to be broken up and distributed among multiple accounts.

55.     Once deposited into the Colombian account, the leaders, plateros, or domiciliarios who executed the deposits in Colombia sent photographs of the deposit receipts as confirmation to Alcala Network leaders.

56.     If the Alcala Network leaders were provided a token, the leaders, plateros, or domiciliarios operating in Colombia withdrew the illicit proceeds from Colombian ATMs and delivered them during clandestine deliveries in various cities in Colombia, including Medellín, Cúcuta, Bogotá, and Bucaramanga. The "token" for those deliveries, was the serial number of a low-denomination Colombian peso note. Along with the tokens, Alcala Network leaders were sent secret code phrases and telephone information for couriers who accepted the deliveries in Colombia.

57.     Once a delivery took place, the Colombian peso note used as the token was signed by the courier and the amount of money delivered was written on the note. A photograph of the signed peso note was then sent to Alcala Network leaders as confirmation that the delivery was successful.

Alcala Network Accounts with ATM Cards
and Approximate Amounts Withdrawn in Colombia During Course of Conspiracy

| Account Holder | Number of ATM Cards | Amount Withdrawn in Colombia |
|---|---|---|
| Leonardo Alcala-Carrillo | 2 | $103,484.68 |
| LM Advance Corp | 64 | $2,548,359.01 |
| Exportrading Global Corp | 147 | $3,265,833.14 |

| LJJ Finance, LLC | 76 | $755,629.15 |
|---|---|---|
| Yosimar Rivas-Hernandez | 3 | $299,170.98 |
| YR Autoparts Corp | 44 | $6,340,560.42 |
| VIP Motor Store Corp | 30 | $2,685,165.67 |
| Zulymar Rivas Hernandez | 1 | $1,380.19 |
| Newvia Corp | 13 | $173,993.04 |
| Close Worldwide Corp | 16 | $1,478,461.97 |
| Rivasexport Corp | 18 | $1,729,222.33 |
| Juan Pablo Morales-Ayala | 9 | $608,826.22 |
| JM Auto Investors Corp | 50 | $1,921,578.71 |
| New Era Global Business Corp | 20 | $729,431.78 |
| Flora Export Corp | 42 | $4,821,702.82 |
| Sportroad Corp | 21 | $174,919.38 |
| BioAvila, LLC | 13 | $57,576.20 |
| TOTAL | 569 | $27,695,295.69 |

### Efforts to Protect the Scheme

58.     Alcala Network leaders at times directed shell company owners to contact the financial institutions to remove holds on wire transfers, unblock ATM/Debit cards, and make inquiries about transactions.

59.     In those interactions with the financial institutions, the leaders directed the shell company owners to record themselves speaking with financial institution personnel for the purposes of providing the recordings to proveedores as proof that the Alcala Network was not stealing the proveedores' money.

17

60.   At times, shell company owners were informed that their accounts were being closed or that their funds were being seized by the United States.  In those instances, Alcala Network leaders created false supporting documentation, such as invoices and transaction records, that the shell company owners could provide to the financial institutions or the United States in an effort to gain access to the held or seized funds.

61.   Members of the Alcala Network either failed to file federal tax returns as required or filed federal tax returns that contained false information about the income, expenses, and business activities of themselves and the shell companies that they controlled.

All in violation of 18 U.S.C. § 1956(h).

## FORFEITURE NOTICE

62.   The allegations in this Indictment are realleged and incorporated by reference for the purpose of providing notice of forfeiture pursuant to 18 U.S.C. § 982(a)(1).

63.   The United States gives notice to the defendants charged in this Indictment, that upon conviction of any of these offenses, all property, real or personal, involved in such offenses, and all property traceable to such property, is subject to forfeiture under 18 U.S.C. § 982(a)(1).

64.   The property to be forfeited includes, but is not limited to, a sum of money in United States currency representing the amount of proceeds traceable to the commission of said offenses and the following specific property:

18

a)    $136,252.26 seized on October 16, 2020, from TD Bank, NA account ending in 3953, held in the name of YR Autoparts Corp;

b)    $75,557.38 seized on October 16, 2020, from TD Bank, NA account ending in 2335, held in the name VIP Motor Store Corp;

c)    All assets in TD Bank, NA account ending in 2335, held in the name VIP Motor Store Corp;

d)    All assets in TD Bank, NA account ending in 3953, held in the name of YR Autoparts Corp;

e)    All assets in TD Bank, NA account ending in 3975, held in the name of JM Auto Investors Corp;

f)    All assets in TD Bank, NA account ending in 2511, held in the name of Flora Export Corp;

g)    All assets in Citibank, NA account ending in 3393, held in the name of Leonardo David Alcala Carrillo;

h)    All assets in Citibank, NA account ending in 9806, held in the name of LJJ Finance LLC;

i)    All assets in Citibank, NA account ending in 5263, held in the name of LMA Invest 2020 Corp;

j)    All assets in Wells Fargo Bank, NA account ending in 1425, held in the name of Leonardo D Alcala;

k)    All assets in Wells Fargo Bank, NA account ending in 3636, held in the name of Yosimar D Rivas Hernandez;

l)    All assets in Wells Fargo Bank, NA account ending in 4704, held in the name of YR Autoparts Corp;

m)    All assets in Wells Fargo Bank, NA account ending in 4738, held in the name of Brown Star LLC;

n)    All assets in Wells Fargo Bank, NA account ending in 6274, held in the name of LM Advance Corp;

o)    All assets in Wells Fargo Bank, NA account ending in 6981, held in the name of JD One Service;

p)    All assets in Wells Fargo Bank, NA account ending in 6999, held in the name of BioAvila LLC;

q)    All assets in Bank of America, NA account ending in 4712, held in the name of VIP Motor Store Corp;

r)    All assets in Bank of America, NA account ending in 5950, held in the name of BioAvila LLC;

s)    All assets in JPMorgan Chase Bank, NA account ending in 1281, held in the name of Exportrading Global Corp;

t)    All assets in Regions Bank account ending in 2209, held in the name of LM Advance Corp;

u)    All assets in PNC Bank, NA account ending in 2639, held in the name of Leonardo David Alcala Carrillo;

v)    All virtual assets in wallets controlled by BAM Trading Services Inc. d/b/a Binance.US, held in the name of Leonardo D Alcala, UID ending in 3854;

w)    All virtual assets in wallets controlled by BAM Trading Services Inc. d/b/a Binance.US, held in the name of Yosimar Del Carmen Rivas Hernandez, UID ending in 6871;

x)    All virtual assets in wallets controlled by BAM Trading Services Inc. d/b/a Binance.US, held in the name of Franklin Augusto Lopez Ramirez, UID ending in 7856;

y)    All virtual assets in wallets controlled by BAM Trading Services Inc. d/b/a Binance.US, held in the name of Juan Pablo Morales Ayala, UID ending in 3623;

z)    All virtual assets in wallets controlled by Coinbase, held in the name of Leonardo Alcala, UID ending in 40d5;

aa)    All virtual assets in wallets controlled by Coinbase, held in the name of Jorge Alcala, UID ending in bc24;

20

bb)    All virtual assets in wallets controlled by Coinbase, held in the name of Juan Morales, UID ending in da27; and

cc)    All virtual assets in wallets controlled by Coinbase, held in the name of Franklin Lopez, UID ending in b8a1.

### Substitute Assets

65.    The defendants charged in this Indictment are notified if property subject to forfeiture, because of any act or omission of the defendants,

a)    cannot be located upon the exercise of due diligence;

b)    has been transferred or sold to, or deposited with, a third party;

c)    has been placed beyond the jurisdiction of the court;

d)    has been substantially diminished in value; or

e)    has been commingled with other property which cannot be divided without difficulty,

21

the United States will seek to forfeit any other property of the defendants up to the total value of the property subject to forfeiture pursuant to 21 U.S.C. § 853(p), as incorporated by reference in 18 U.S.C. § 982(b) and 28 U.S.C. § 2461(c).

**A TRUE BILL**

_____     03/09/22
FOREPERSON                    DATE

W. STEPHEN MULDROW
United States Attorney


Myriam Y. Fernández-González
Assistant United States Attorney
Chief, Asset Recovery and
Money Laundering Division


Daniel J. Olinghouse
Assistant United States Attorney

22